IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAFE SKIES CLEAN WATER WISCONSIN, INC.,
    Plaintiff,
    1148 Williamson St.
    Madison, WI 53703,

        v.                Docket No.

UNITED STATES AIR FORCE,
    1690 Air Force Pentagon
    Washington, DC 20330-1670,

JOHN P. ROTH,
    ACTING SECRETARY OF THE AIR FORCE,
    1670 Air Force Pentagon
    Washington, DC 20330-1670,

NATIONAL GUARD BUREAU,
    3501 Fetchet Avenue
    Joint Base Andrews, MD 20762-5157,

    and

GENERAL DANIEL R. HOKANSON,
    CHIEF, NATIONAL GUARD BUREAU,
    111 S. George Mason Dr.
    Arlington, VA 22204,

    Defendants.

**COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF**

**INTRODUCTION**

1. Safe Skies Clean Water Wisconsin, Inc. ("Safe Skies") challenges a decision of the U.S. Air Force ("Air Force") and the National Guard Bureau ("NGB") selecting the Air National Guard ("ANG") location at the 115th Fighter Wing Installation, Dane County Regional Airport, Madison, Wisconsin (also known as Truax Field ("Truax")), for Operational Beddown of F-35A Aircraft following the issuance of an Environmental Impact Statement ("EIS").

1

2. Safe Skies' claims arise under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.; the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d); and the Administrative Procedure Act ("APA"), 5 U.S.C. 701 *et seq*.

3. The NGB, on behalf of the ANG, prepared one EIS to evaluate the potential consequences to the human and natural environment in each of five locations that would result from implementation of the Beddown of the ANG F-35A combat fighter jet ("the Proposed Action"). The five locations are: Madison, WI; Boise, ID; Jacksonville, FL; Mt. Clemens, MI; and Montgomery, AL.

4. The Air Force issued the final EIS on February 28, 2020, and the Record of Decision ("ROD") on April 14, 2020.

5. The 115th Fighter Wing ("115 FW") is a unit of the Wisconsin Air National Guard, ("WIANG") which is stationed at Truax Field Air National Guard Base, Madison, Wisconsin, that currently has F-16 fighter jets based at it.

6. The Air Force proposes to replace the F-16s with F-35As.

7. The proposed F-35A fighter jets are expected to be louder and fly more frequently than the F-16 jets currently based at Truax Field. The noise from the current F-16 jet testing and training is already unacceptable to many of Safe Skies' members.

8. The Air Force and NGB acted illegally by a) failing to adequately study and disclose the major and significant environmental effects of the Proposed Action as required by NEPA, 42 U.S.C. § 4332(2)(c); and b) acting arbitrarily, capriciously and with abuse of discretion, or otherwise not in accordance with the law, and without observance of procedure required by NEPA and the APA.

## JURISDICTION

9. This Court has jurisdiction under 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the National Environmental Policy Act, 42 U.S.C. §§ 4331 *et seq.*; the Administrative Procedure Act, 5 U.S.C. §§ 701-706; the Declaratory Judgment Act, 28 U.S.C. 2201-2202; and the Equal Access to Justice Act, 28 U.S.C. § 2412.

10. An actual, justiciable controversy exists between plaintiff and defendants. The requested declaratory judgment and injunctive relief are therefore proper under the Declaratory Judgment Act, 28 U.S.C. 2201-2202; and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

11. The United States has waived sovereign immunity with respect to the claims raised herein under 5 U.S.C. § 702. Plaintiff has exhausted all administrative remedies and has no adequate remedy at law.

## VENUE

12. Venue is proper in this Court under 28 U.S.C. 1391(e).

## PARTIES

13. Safe Skies Clean Water Wisconsin, Inc. ("Safe Skies") is a nonprofit corporation organized under the laws of Wisconsin.

14. Safe Skies' purpose is to educate the public concerning the dangers inherent in the Beddown of F-35A Joint Strike Fighter jets at Truax Air National Guard base in Madison as well as the need for the NGB, Air National Guard and Air Force to clean-up existing contamination of groundwater, surface water, drinking water and soils, caused by the use of fire-fighting foams and other materials on the base.

15. Safe Skies accomplishes its mission by informing the local citizenry of the Air Force and NGB's plans and their potential negative environmental and socioeconomic impacts on the

community by means of a website, newsletters, forums, and public activity. It has a mailing list of over 2,000 people.

16. Since 2019, Safe Skies has sponsored a series of public forums, appeared on radio shows, and brought speakers to Madison for presentations, press conferences and interviews.

17. Safe Skies and its members are concerned about the noise that F-35As produce, and the negative effects this long-term extremely loud noise will have on members who live in and near the flight paths of the F-35As.

18. Many of Safe Skies' members reside very near Truax Field and in the flight paths of current and proposed fighter jets.

19. Many members of Safe Skies live within the current 65 dB DNL noise contour, and the 65 dB DNL contour predicted after the arrival of the proposed F-35A fighter jets.

20. Many of Safe Skies' members are already injured by the F-16s in that when the F-16s fly in and out of Truax, their houses shake; they cannot hear people in routine conversation when indoors, outdoors, on the phone, or on computer calls, meetings or school; they become stressed; they suffer detrimental personal, physical, mental health, educational, and economic impacts from the noise and vibrations.

21. These injuries will be more severe and more frequent when F-35As are in place.

22. Safe Skies' members who live in current and proposed 65 dB, and higher, DNL levels will suffer injury in fact from the increased noise the F-35As will bring to Madison.

23. Safe Skies' members will be injured because the F-35As will produce noise that will interfere with members' enjoyment of their homes, health, and the education of their children.

24. Safe Skies is also concerned about the large amount of per- and polyfluoroalkyl substances ("PFAS") emitted from the base and known to be polluting municipal wells,

particularly in low-income neighborhoods near the airport, as well as the groundwater, soils, Starkweather Creek, Lake Monona, and the Yahara chain of lakes.

25. Many of Safe Skies' members reside in locations that have and will suffer the impacts of the increased emissions of PFAS that will result from the activities authorized in the EIS in that they drink from wells that already have PFAS in them, and eat fish from Starkweather Creek that also have PFAS in them.

26. Safe Skies' members also live near and recreate in the Cherokee Marsh Area, located approximately one mile from Truax.

27. The Air Force is the agency that issued the "United States Air Force F-35a Operational Beddown Air National Guard Environmental Impact Statement" and Record of Decision, which are the subject of this lawsuit.

28. John P. Roth is the Acting Secretary of the Air Force. He is named as a defendant in his official capacity.

29. The NGB is a joint activity of the Department of Defense (DOD Directive 5105.77).

30. The ANG is a federal military reserve force of the Air Force.

31. The NGB is the lead agency for the EIS pursuant to 40 C.F.R. §§ 1501.5 and 1508.5.

32. The Air Force and NGB, as agencies of the federal government, are required to comply with various laws and regulations, including the National Environmental Policy Act ("NEPA"; 42 U.S.C. §§ 4321 *et seq.*), the Council on Environmental Quality's NEPA regulations, 40 C.F.R. Parts 1500 to 1508, and the Air Force's own NEPA-implementing regulations, 32 C.F.R. Part 989.

33. General Daniel R. Hokanson is the current Chief of the National Guard Bureau. He is named as a defendant in his official capacity.

## FACTUAL BACKGROUND

### The Air Force Listed Effects of F-35As in Five Locations in one Environmental Impact Statement even though Two Locations Had Already Been Selected for the F-35As

34. The Air Force and NGB have placed F-16s at Truax Air Field in Madison, WI, since 1992.

35. In December, 2016, the Air Force announced it had selected five locations as semi-finalists for locating F-35A jets: Madison, WI; Boise, ID; Jacksonville, FL; Mt. Clemens, MI; and Montgomery, AL.

36. On December 21, 2017, well before preparing an EIS, the United States Air Force announced it selected Madison's Truax Field, home of the 115th Fighter Wing of the Air National Guard, and Montgomery, Alabama, home of the 187th Fighter Wing of the ANG, as the two sites that would receive the F-35A aircraft.

37. In August, 2019, almost two years *after* selecting Madison for the F-35A, the Air Force released a draft Environmental Impact Statement discussing five locations.

38. The Air Force issued the final EIS on February 28, 2020, and the Record of Decision on April 14, 2020, reaffirming its selection of the same two sites it had selected in 2017.

## CLAIMS FOR RELIEF

### Count I
### Violation of NEPA – Predetermination of Outcome

39. Plaintiff realleges and incorporates by reference the preceding paragraphs.

40. NEPA requires that federal agencies do not set out with predetermined outcomes when preparing Environmental Impact Statements. 42 U.S.C. § 4332(2)(c).

41. In December, 2016, the Air Force announced it had selected five locations as semi-finalists for locating F-35A jets: Madison, WI; Boise, ID; Jacksonville, FL; Mt. Clemens, MI; and Montgomery, AL.

42. Defendants announced in 2017 that the F-35As are coming to a low-income, heavily minority community in Madison, Wisconsin.

43. In 2018 and 2019, defendants undertook an exercise of listing noise and environmental impacts at locations in five states, but failed to select the sites that would have harmful impacts on the least number of people.

44. In the 2020 EIS, the Air Force stated that, "The goal of F-35A basing and fielding is to continue to provide optimum Combatant Commander support and to efficiently meet regional and global receiver demands *while replacing the existing F-15, F-16*, or A-10 fighter attack aircraft (emphasis added)." (Final EIS, Cover Sheet).

45. The remaining several hundreds of pages of the EIS do not discuss the need to replace the F-16s.

46. However, in the ROD the Air Force states in the "Decisions" paragraph that summarizes the EIS and ROD that, "Both selected installations have aging F-16 aircraft in need of replacement…" (ROD, p. 10).

47. The age and condition of the aircraft were not factors discussed in the EIS.

48. The public was not told that age and condition were factors and therefore could not comment on them.

49. The Air Force failed to disclose what are the ages and conditions of the F-16s at Truax.

50. The Air Force failed to consider alternatives that would have addressed the age and condition, other than replacement of all F-16s with F-35As.

51.     The EIS and ROD make it clear the outcome was predetermined and based on the age of the aircraft.

## Count II
### Violation of NEPA – Failure to Take a Hard Look at the Detrimental Noise Impacts that F-35As will have on the Quality of Life of People in Madison, WI

52.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

53.     NEPA requires agencies to take a "hard look" at significant impacts and alternatives. 5 U.S.C. § 706.

54.     Defendants failed to take a hard look at the significant harms the noise from the F-35As will cause on the well-being of thousands of people in Madison, WI.

55.     Defendants concluded that after the F-35As are installed, a total of 1,318 households and 2,766 people would be within the 65 dB DNL, an increase of 1,019 households and 2,215 people.

56.     In addition, defendants concluded that 949 more acres outside of the airport property would be newly exposed to 65 to 70 dB DNL, 320 more acres to 70 to 75 dB, and 51 more acres exposed to 75 to 80 dB DNL.

57.     Defendants listed totals but failed to take a hard look at the harms the Proposed Action will cause to people's lives.

58.     Defendants listed schools and churches that would be adversely impacted but failed to take a hard look at how those peoples' lives would be affected.

59.     Defendants used an outdated daily average noise standard of 65 dB DNL when other airports use 55dB and 60 dB. The 65 dB DNL standard is over 50 years old, and has not been updated.

60. By using the outdated standard, defendants fail to account for impacts of noise including stress, sleep disturbance, damage to the eardrum and cochlea hair cells of children, development of irreversible post-traumatic stress disorder, and a reduction in the educational performance of children, all of which have been shown to occur at lower levels in the 50 years since that standard was announced.

61. By using the outdated 65 dB DNL noise standard, defendants failed to account for noise exposure of low-income and minority populations living just outside this noise contour, but who will suffer greatly from the noise.

62. Defendants failed to take a hard look at the impacts that will be felt by 60,000 people who live within three miles of Truax Field and are already adversely impacted by F-16 flights.

63. Defendants failed to provide the measured SEL and Lmax levels generated from F-35As. The level of peak noise should be made known to the public. This would be the instantaneous noise level to which people are exposed.

64. Defendants arbitrarily used assumptions when drawing the contour lines which conveniently omit some low-income communities such as the Truax apartments.

65. Defendants failed to provide short-term noise contours; fail to show the distance impacts of the noise will extend from Truax field; and fail to divulge the more informative short-term noise exposure and how many events people in the community will hear daily.

66. Defendants failed to take a hard look at the impacts of the use of afterburners. Defendants used an assumption of a 5% afterburner usage, but the Air Force is operating the F-35As using afterburners 100% of the time for takeoffs at Hill Air Force Base in Utah, making it seem unlikely there would be such a lower amount of usage at Truax.

67. The use of afterburners increases the noise levels and will increase the harms suffered by plaintiff's members.

68. Defendants failed to take a hard look at the impact on the reduction in property values due to the increased noise, specifically the impact the reduction will have on low-income people and on the City of Madison.

**Count III**
**Violation of NEPA – Failure to Consider Cumulative Impacts of Increased PFAS and other Pollutants on Already Polluted Drinking and Groundwater**

69. Plaintiff realleges and incorporates by reference all preceding paragraphs.

70. CEQ regulations require an agency to consider the "direct," "indirect," and "cumulative" impacts of a proposed action. 40 C.F.R. § 1508.25. "Effect includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8.

71. The Air Force and NGB violated NEPA by failing to consider the cumulative impacts of the Proposed Action on the environment and the public health.

72. The NGB and ANG will continue to use fire-fighting foam that contains PFAS in its routine operations of the F-35As.

73. Truax Air Field is already known to be a source of PFAS contamination that is leaching off the site and into drinking, groundwater and surface water throughout Dane County.

74. The Wisconsin Department of Natural Resources ("WDNR") has ordered defendants to further investigate the extent of the contamination of PFAS and to clean up this contamination.

75. Defendants failed to comply, and continue to fail to comply, with this order.

76. Defendants failed to consider the cumulative impacts of the continued use of materials containing PFAS.

77. Increased PFAS discharges from F-35A-related activities will migrate into Starkweather Creek, Lake Monona, the Yahara chain of lakes and into public drinking water systems, and fish consumed by the public.

78. Water bodies that are already classified as impaired under Section 303(d) of the Clean Water Act will be made even more polluted by the increased amounts of PFAS and other toxins that will migrate from the base into the groundwater, surface water, and stormwater.

79. The Proposed Action will require construction of many separate projects, many of which will result in disturbance of already-contaminated soils. The EIS fails to consider the effects of increased contamination resulting from construction activities.

80. Defendants failed to take a hard look at the negative environmental impacts on water from other chemicals that will be released during routine operations from F-35As, including fuels, oils, cadmium, copper-beryllium, and hydrazine.

81. Defendants failed to take a hard look at the cumulative impacts on water pollution associated with the proposed F-35 Beddown Proposed Action.

### Count IV
### Violation of NEPA – Failure to Adequately Consider Environmental Justice

82. Plaintiff realleges and incorporates by reference all preceding paragraphs.

83. Executive Order 12,898 requires federal agencies to determine whether a Proposed Action will have a disproportionately adverse effect on minority and low-income populations. 59 Fed. Reg. 7629 (Feb. 16, 1994).

84. Defendants failed to take a hard look at the impacts of the Proposed Action on low-income and minority communities.

85. Defendants never implemented a detailed community outreach strategy aimed at gaining local input from all communities that would be affected and did not specify targeted activities to reach low-income and/or minority communities.

86. Defendants conclude that, "Four block groups, located south of the airport, are considered low-income population areas and would be newly exposed to noise levels of 65 dB DNL or higher. One block group located west of the airport is both a minority and low-income community and would be newly exposed. The increase in noise exposure to the south and west of the airport would disproportionately impact low-income areas and the increase in noise exposure to the east of the airport would disproportionately impact a low-income minority population."

87. The number of people that will be impacted is large. An additional 1,923 people will be in the 65-70 dB level, 292 people will be in the 70-75 dB level, or 1,019 households (WI-33). The Air Force considers the 65-75 dB range as "potentially incompatible for residential use."

88. Defendants acknowledge that the Richardson School currently has a DNL of 68 dBA, and that will increase to 70.

89. The school serves students with autism and other special needs and sits directly adjacent to the airport runway.

90. Defendants fail to take a hard look at the actual impacts to low-income and minority populations.

91. Defendants arbitrary and capriciously chose the two sites (Truax and Montgomery County) that will have "*significant* disproportionate impacts to low-income and minority populations as well as children," and did not select the three sites that would have "*no significant* disproportionate impacts to low-income or minority populations (emphasis added)." (ES-26)

92. The NGB will continue to use foam that contains PFAS in its trainings, and this use will increase the amount of PFAS released.

93. Defendants failed to take a hard look at the disproportionate impact the PFAS continuing to migrate off-base will have on low-income and minority populations who live near Truax, drink from the City water, fish in Starkweather Creek, and live and recreate near the contaminated soil.

### Count V
### Violation of NEPA – Failure to Take a Hard Look at Air Quality Impacts of Criteria and Hazardous Air Pollutants

94. Plaintiff realleges and incorporates by reference all preceding paragraphs.

95. Defendants failed to take a hard look at the impacts from the increased amounts of certain criteria air pollutants they will cause to be released.

96. Defendants list amounts in a chart and conclude the impacts will be insignificant.

97. Defendants used no readily available analysis tools to determine the air quality impacts of the project such as air monitoring or dispersion modeling.

98. The impacts are not insignificant: studies have shown that criteria air pollutants emitted from airports increase exposure to surrounding residents and the increased emissions from F-35As will have a detrimental impact on people living near the base and county airport.

99. Defendants, after conducting no monitoring, dispersion modeling or any other analysis, simply concluded with no scientific basis that mobile sources, such as aircraft operations, would be functioning intermittently over a large area and would produce negligible ambient hazardous air pollutant ("HAP") emissions.

100. Defendants conclude that HAPs would not create significant or adverse health risks to humans living adjacent to airfields or underneath airspace in which aircraft operate, and are not further evaluated in the analysis.

101. Defendants' conclusion about HAPs ignores research done by the EPA and Air Force showing that military aircraft release significant amounts of formaldehyde, benzene, toluene and xylene.

### Count VI
### Violation of NEPA – Failure to Adequately Address Alternatives

102. Plaintiff realleges and incorporates by reference all preceding paragraphs.

103. The defendants failed to take a hard look at the alternatives. Defendants failed to evaluate, recommend, or select the sites that will cause harm to the least number of people.

104. Defendants' own data shows that locating F-35As at Truax will adversely impact the greatest number of people of the five locations (292 people in Madison will be located in the 70-75 DNL contour where housing is incompatible compared to 199 (ID), none (FL); 130 (MI); and 35 (AL)).

105. Defendants' data shows that locating F-35As at Truax will adversely impact the greatest number of low-income people of the five locations studied (10 new block groups would be exposed, including ones exceeding 50% minority and almost 50% in poverty; as compared to three block groups (ID), zero (FL), six (MI) and two (AL)).

106. Defendants' data shows that the Proposed Action will increase by the second largest number the acres that will be newly exposed to noise levels exceeding the 65 dB DNL (199 acres for Madison, compared to 74 (ID), none (FL), 475 (MI); and 37 (AL)).

107. Defendants' data shows that the Proposed Action will decrease by the second largest amount the property value percentage of the tax base of the County selected for the installation

14

(.03-.27 for Dane County; compared to .01-.13 (ID); .01-.01 (FL); .04-.038 (MI); and .01-.14 (AL)).

108. Truax is located in an urban area where many more people will be impacted by the F-35A jets than would be in the other sites named in the EIS.

109. These facts show that defendants' decision was arbitrary and capricious. Defendants did not select the sites with the least harmful impacts.

110. Defendants failed to consider alternative missions for the 115th Fighter Wing, should the F-35As not come to Truax.

111. These alternative missions include dozens of alternatives, such as: medical training; emergency response functions; and cybersecurity positions.

112. Defendants failed to consider flying the planes less frequently.

113. Defendants failed to consider making more use of Volk Field and using Truax a lesser amount of time.

**Count VII**
**Violation of NEPA – Failure to Adequately Consider Climate Change**

114. Plaintiff realleges and incorporates by reference all preceding paragraphs.

115. Defendants' table shows F-35As will emit almost 22,000 tons/year of $CO_2$, compared with F-16s' emissions of $CO_2$ at 9,263 tons/ year.

116. Defendants gloss over the significance of their actions by saying that F-35As will "modestly increase" greenhouse gas emissions.

117. Disclosing only the volume of greenhouse gas emissions tells the public and decisionmakers nothing about the scale of the project's "ecological" impacts, as NEPA requires, 40 C.F.R. § 1508.8(b), or the "significance" of such impacts.

118. Without some actual analysis of the incremental impacts, it is impossible for defendants to know whether a change in GHG emissions will be a significant step toward averting the tipping point and irreversible adverse climate change.

119. Defendants acknowledge that impacts of climate change on the region will include severe rain events and flooding, but trivialize it by stating that the severe effects could impact the mission activities rather than looking at the effects on the region.

120. Defendants failed to acknowledge historical flooding that has already occurred in Dane County and the County's vulnerability due to the presence of the chain of lakes.

121. Defendants fail to take a hard look at the serious impact of the Proposed Action on climate change.

## Count VIII
### Violation of NEPA and the APA – Failure to Provide Adequate Notice and Public Participation

122. Plaintiff realleges and incorporates by reference all preceding paragraphs.

123. Defendants violated the public participation and notice requirements of NEPA and implementing regulations by failing to inform the public of its proposed action and failing to allow for meaningful and timely public involvement.

124. The two notices in the print edition of the Wisconsin State Journal on August 25 and September 8, 2019, were inadequate to provide meaningful access to neighbors of the Proposed Action.

125. Defendants should have placed notices in community centers in the urban area surrounding Truax and in the affected neighborhoods next to Truax, and notices in free publications or commonly visited places.

126. The public hearing held on September 12, 2019, was held at a location more than 8 miles from the site, and at a location that takes more than one hour to get to by bus.

127. The public hearing should have been held at a site near the affected households.

128. Therefore, the approval is arbitrary, capricious, an abuse of discretion, and not in accordance with the law under NEPA and the APA.

### Count IX
### Violation of NEPA and the APA – Failure to Produce a Supplemental Environmental Impact Statement

129. Plaintiff realleges and incorporates by reference all preceding paragraphs.

130. Defendants violated the law by failing to produce a Supplementary Environmental Impact Statement ("SEIS") which would provide an estimate of the cost to and timeframe for the Air Force and ANG to investigate and remediate the existing PFAS contamination of groundwater and surface waters caused by the trainings at Truax Field.

### Count X
### Failure to Take a Hard Look at Impacts on Wildlife

131. Plaintiff realleges and incorporates by reference all preceding paragraphs.

132. Defendants failed to take a hard look at impacts on Cherokee Marsh Conservation Park and Cherokee Marsh State Natural Area (an urban refuge located approximately 1 mile from Truax) (together, "Cherokee Marsh").

133. A large portion of Cherokee Marsh's 2,000 acres of wetlands is newly included in the 65 dB DNL, but defendants failed to evaluate the impacts to wildlife in this area.

134. Defendants failed to survey Cherokee Marsh for federal and state-listed species.

135. Cherokee Marsh is home to many species of birds, plants and wildlife that are listed including the Bald Eagle, Henslow's Sparrow, Butler's Garter Snake.

136. Defendants failed to take a hard look at the effects of the noise and pollutants on the listed species.

### Count XI
### Violation of the Administrative Procedure Act

137. Plaintiff realleges and incorporates by reference the preceding paragraphs.

138. The actions of defendants as described above are arbitrary, capricious, and an abuse of discretion; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; unsupported by substantial evidence; and unwarranted by the facts. 5 U.S.C. § 706(2)(A), (C), (D), (E), (F).

### DEMAND FOR RELIEF

WHEREFORE, plaintiff prays that this Court make and enter its order:

1. Declaring that:

    A. Defendants, in issuing an EIS and ROD, failed to comply with NEPA by having a predetermined outcome;

    B. Defendants failed to take a hard look at detrimental noise impacts in violation of NEPA and its implementing regulations;

    C. Defendants violated NEPA by failing to adequately consider the cumulative impacts of increased PFAS on already-polluted drinking, ground surface water and fish in the Starkweather Creek and Yahara chain of lakes watersheds water;

    D. Defendants violated NEPA by failing to adequately consider environmental justice impacts in violation of NEPA and its implementing regulations;

    E. Defendants violated NEPA by failing to take a hard look at air quality impacts of the F-35As;

    F. Defendants violated NEPA by failing to adequately address alternatives;

G.  Defendants violated NEPA by failing to adequately consider climate change;

H.  Defendants violated NEPA and the APA by failing to provide adequate notice and public participation;

I.  Defendants violated NEPA and the APA by failing to produce a Supplemental Environmental Impact Statement;

J.  Defendants violated NEPA by failing to take a hard look at impacts on wildlife in violation of NEPA and its implementing regulations;

K.  Defendants violated the APA by failing to comply with NEPA; and

L.  Defendants' actions and proposals are arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction, authority, and limitations, without observance of procedure required by law, unsupported by substantial evidence and unwarranted by the facts, in violation of the APA.

2.  After hearing, permanently enjoin the defendants and all others acting in concert with them from carrying on or permitting any activities in furtherance of the construction of the Proposed Action until such time as the defendants prepare an adequate EIS and a supplemental EIS, the sufficiency of the environmental impact statements to be determined by this Court.

3.  Awarding plaintiff such other and further relief as the Court may deem just and proper, including costs, attorneys' fees, expert witness fees and other expenses of litigation;

4.  Awarding such other relief as the Court deems just and proper.

/s/ Kathleen G. Henry
Kathleen G. Henry (Bar No. MO0001)
Dairyland Public Interest Law
PO Box 352
Madison, WI 53701
(608) 213-6857
khenry@dairylandpublicinterestlaw.com
*Attorneys for Plaintiff*