**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFE SKIES CLEAN WATER WISCONSIN, INC.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES AIR FORCE, *et al.*,<br><br>Defendants. | Civil Action No. 21-0634 (CKK) |

**MEMORANDUM OPINION**
(September 11, 2026)

In this case, a nonprofit corporation challenges a decision by the U.S. Air Force ("USAF") and the National Guard Bureau ("NGB") to place and operate F-35A aircraft at a regional airport in Madison, Wisconsin. The Plaintiff, Safe Skies Clean Water Wisconsin, Inc. ("Safe Skies"), alleges that the USAF, NGB, and other Defendants violated the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") by failing to analyze fully the effects of this decision, providing insufficient notice and opportunities for public participation, and failing to consider reasonable alternatives. Upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire record, the Court concludes that the challenged actions are consistent with NEPA and the APA. Accordingly, the Court shall **GRANT** the Defendants' [29] Motion for Summary Judgment and **DENY** the Plaintiff's [28] Motion for Summary Judgment.

---

[1] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto:

- The Plaintiff's Memorandum in Support of its Motion for Summary Judgment ("Pl.'s Mem."), Dkt. No. 28;
- The Defendants' Memorandum in Support of the Defendant's Cross-Motion for Summary Judgment and Opposition to the Plaintiff's Motion for Summary Judgment ("Defs.' Mem."), Dkt. No. 29-1;
- The Plaintiff's Reply and Opposition ("Pl.'s Reply & Opp'n"), Dkt. No. 33;
- The Defendant's Reply ("Defs.' Reply"), Dkt. No. 34; and
- The Joint Appendix ("J.A."), which the parties filed in 26 volumes as attachments to Dkt. Nos. 35 and 36.

In an exercise of its discretion, the Court concludes that oral argument is not necessary to the resolution of the issues pending before the Court. *See* LCvR 7(f).

# I. BACKGROUND

## A. Statutory Framework

### 1. The National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to analyze the environmental effects of "major Federal actions" and to prepare reports summarizing those effects. 42 U.S.C. § 4332(2)(C). If it is "reasonably foreseeable" that a proposed action will have a "significant effect" on the environment, the responsible agency must prepare an environmental impact statement ("EIS"). *Id.* § 4336(b)(1). An EIS is "a detailed written statement" that addresses the foreseeable effects of the proposed action, including any effects that "cannot be avoided" if the action is taken. *Id.* §§ 4336e(6), 4332(2)(C)(i)–(ii). An EIS must also address "a reasonable range of alternatives . . . that are technically and economically feasible, and [that] meet the purpose and need of the proposal." *Id.* § 4332(2)(C)(iii).

The requirement to prepare and publish an EIS serves two purposes. First, it "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Second, it "serves a larger informational role" by assuring the public that the agency has considered environmental concerns and, "perhaps more significantly, provid[ing] a springboard for public comment." *Id.*

Although NEPA requires an agency to take a "hard look" at environmental consequences and adhering to its provisions is "almost certain to affect [an] agency's substantive decision," the Act itself "does not mandate particular results." *Robertson*, 490 U.S. at 350. It "imposes no substantive environmental obligations or restrictions," and it "does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 173 (2025). In short, "NEPA is a purely procedural statute." *Id.*

2. The Administrative Procedure Act

The Administrative Procedure Act ("APA") requires federal agencies to engage in "reasoned decisionmaking." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). When an agency exceeds its lawful authority or acts in a manner that is arbitrary and capricious, an aggrieved party with standing may seek judicial review under the APA, and a reviewing court must "hold unlawful and set aside" the agency's action. 5 U.S.C. § 706(2). When evaluating a claim that an agency's decision was arbitrary and capricious, a reviewing court's review is necessarily "narrow," and the court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Instead, the court decides only whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Id.* However, when evaluating a claim that an agency acted contrary to law, the court "must independently decide" the relevant legal issues, without giving deference to the agency's interpretation of statutes. *Hosp. Menonita De Guayama, Inc. v. NLRB*, 183 F.4th 745, 753 (D.C. Cir. 2026) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)).

**B. Factual Background**

This case arises from the U.S. Air Force's choice of two new locations to host F-35A fighter aircraft. The USAF refers to the placement of these aircraft as a "beddown." *See* J.A., Dkt. No. 35-1 at 1. After deciding to replace existing fighter aircraft at two Air National Guard ("ANG") installations with the newer F-35A model, the USAF studied 18 candidate installations to determine whether they could successfully support the new aircraft. *See* J.A., Dkt. No. 35-1 at 6–21. Based on this initial study, the USAF identified five top candidates for the F-35A beddown, including two preferred alternatives: the 115th Fighter Wing at Truax Field at Dane County Regional Airport in in Madison, Wisconsin, and the 187th Fighter Wing at Dannelly Field at Montgomery Regional Airport in Montgomery, Alabama. *Id.* at 26.

In February 2018, the USAF published a notice of intent to prepare an environmental impact statement ("EIS") for the proposed F-35A beddown. 83 Fed. Reg. 5408 (Feb. 7, 2018). About 18 months later, in August 2019, it completed a Draft EIS, and the Environmental Protection Agency published a notice advertising the draft in the Federal Register. *See* 84 Fed. Reg. 39296 (Aug. 9, 2019). After inviting public comments and holding public hearings, the USAF completed a Final EIS in February 2020. *See* 85 Fed. Reg. 11986 (Feb. 28, 2020) (notice of availability); *see also* J.A., Dkt. No. 35-1 at 1–24 (excerpts of executive summary); *id.*, Dkt. No. 35-5 at 12–26, Dkt. No. 35-6 at 1–2 (excerpts of summaries and responses to comments).

The Final EIS analyzed several areas of environmental consequences that would be associated with placing F-35A aircraft at each of the five candidate installations or adopting the "no action" alternative. *See* J.A., Dkt. No. 35-1 at 6–21 (summarizing analysis). For example, for each candidate, the Final EIS examined expected noise impacts, water pollution, air pollution, greenhouse gas emissions, disproportionate effects on low-income and minority communities and on children, and effects on wildlife. *Id*. The Final EIS also included a detailed explanation of the metrics that the USAF used to evaluate noise impacts. *Id.* at Dkt. No. 35-2 at 31–33.

As relevant to this case, the Final EIS included detailed analyses of several foreseeable impacts that were specific to the proposed Truax Field site. *See* J.A., Dkt. No. 35-3 at 13–43, Dkt. No. 35-4 at 1–39, Dkt. No. 35-5 at 1–2. For example, the Final EIS acknowledged that placing the F-35A aircraft at Truax would result in a temporary increase in military flights that would be higher than the comparable increases at the other candidate sites because the F-16 aircraft previously stationed at Truax would continue to fly an "alert mission" until the F-35A was ready to take over that specific mission. *See* J.A., Dkt. No. 35-1 at 4, 10, Dkt. No. 35-3 at 13–14. It also acknowledged that placing the aircraft at Truax would have negative consequences for

environmental justice because doing so would result in "significant" and "disproportionate" increases in noise exposure for low-income and minority communities and children, while three of the other proposed sites would not have these distributional effects. *See id.*, Dkt. No. 35-2 at 22–23. The analysis further acknowledged that the USAF had detected and measured perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA") contamination in some planned construction areas at Truax, which would need to be managed during any construction. *See id.*, Dkt. No. 35-2 at 29–30, Dkt. No. 35-4 at 34, 37–38.

After issuing its Final EIS, the USAF selected Truax Field in Madison, Wisconsin, and Donnelly Field in Montgomery, Alabama, as the locations for the new F-35A aircraft. J.A., Dkt. No. 35-6 at 27–36. The USAF memorialized these choices in a formal Record of Decisions. *Id.* The USAF explained that it chose Truax Field and Donnelly Field over the available alternatives because those two locations hosted ANG units with "aging F-16 aircraft in need of replacement" and "existing active associations" with active-duty units, which would reduce operational costs to the USAF. *Id.* at 36. By contrast, it explained, the other three locations had "no pressing need to replace their assigned aircraft," and placing the F-35As there would have required establishing new associations, resulting in millions of dollars in additional costs to the USAF each year. *Id.*

In its Record of Decisions, the USAF also committed to preparing mitigation and monitoring plans for both Truax Field and Donnelly Field to address local effects on noise levels, airspace safety, personnel safety, air quality, water quality, and other matters, including specific procedures for the management and mitigation of PFOS, PFOA, and other hazardous materials. *Id.* at 32–36.

### C. Procedural History

After the Defendants issued their Final EIS and Record of Decisions, Plaintiff Safe Skies filed this action under the APA, alleging that the selection of Truax Field was arbitrary and

capricious and contrary to NEPA because the USAF did not adequately consider several environmental effects of locating F-35A aircraft at Truax and did not provide adequate notice and opportunities for public participation. Compl., Dkt. No. 1. The Defendants[2] produced and certified the administrative record, which they later supplemented. *See* Defs.' Notice, Dkt. No. 17; Defs.' Notice, Dkt. No. 19. The Plaintiffs then filed a motion to supplement the administrative record further, which the Court denied after an *in camera* review of a sample of the relevant records. *See* Order, Dkt. No. 24; Order, Dkt. No. 25. The parties then filed motions for summary judgment, which are ripe for decision. *See* Pl.'s Mot., Dkt. No. 28; Defs.' Mot., Dkt. No. 29.

## II. LEGAL STANDARD

A motion for summary judgment is properly granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a case like this one, in which a plaintiff seeks review of an agency decision based on an administrative record, the usual summary judgment standards do not apply. *See Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). Instead, summary judgment is the vehicle through which a district court must decide, "as a matter of law," whether the agency's decision "is supported by the administrative record" and "otherwise consistent with" the relevant legal standards. *See, e.g.*, *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 47 (D.D.C. 2019) (TSC); 5 U.S.C. § 706. In this type of proceeding, "the 'entire case' on review is a question of law" and the district court "sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quoting *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

[2] The Defendants are the U.S. Air Force, the Secretary of the Air Force, the National Guard Bureau, and the Chief of the National Guard Bureau. Compl. ¶¶ 27–29, 33. Dr. Troy E. Meink, in his official capacity as Secretary of the Air Force, and General Steven S. Nordhaus, in his official capacity as Chief of the National Guard Bureau, are automatically substituted for their predecessors as parties to this action. *See* Fed. R. Civ. P. 25(d).

## III. ANALYSIS

Safe Skies challenges the substance and scope of the Defendants' EIS analysis on several grounds, arguing that the Defendants failed to follow the required procedures and either overlooked or insufficiently scrutinized several important considerations. Specifically, Safe Skies argues that the Defendants violated NEPA and the APA because they: (i) impermissibly prejudged the outcome of their site-selection process before completing their environmental analysis, Pl.'s Mem. at 15–20; (ii) did not adequately consider how noise from F-35A operations would affect people living in Madison, *id.* at 20–29; (iii) did not consider the cumulative effects of adding PFOS, PFOA, and other incremental pollution to already polluted drinking water and groundwater, *id.* at 29–30; (iv) did not adequately consider potential disproportionate effects on low-income populations, minority populations, and children, *id.* at 31–34; (v) did not adequately consider the effects of certain air pollutants, *id.* at 35–36; (vi) did not adequately consider alternative site options and the "no action" alternative, *id.* at 36–39; (vii) did not adequately consider the proposed action's effects on climate change, *id.* at 39–40; (viii) did not adequately consider likely effects on wildlife, *id.* at 45–46; (ix) did not produce a supplemental study in response to new information about PFAS contamination near the proposed site, *id.* at 44–45; and (x) did not provide adequate notice and opportunities for public participation, *id.* at 40–44.

After careful consideration of the Plaintiff's arguments and the extensive record in this case, the Court concludes that the Defendants have complied with NEPA and the APA.[3]

[3] This Court's jurisdiction to reach the merits of these claims is not in dispute. *See generally* Defs.' Mem.; *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) (explaining that a federal court cannot "resolve contested questions of law when its jurisdiction is in doubt"). In summary, this Court has subject-matter jurisdiction because this case arises under federal statutes—NEPA and the APA—and the Plaintiff has shown that the challenged actions imminently threaten to cause concrete and judicially redressable injuries to its members, several of whom reside near Truax Field in Madison, Wisconsin. *See* Decl. of Steven Klafka, Dkt. No. 28-2; Decl. of Tehmina Islam, Dkt. No. 28-5; Decl. of Edward Blume, Dkt. No. 28-7.

The Supreme Court recently cautioned lower federal courts that they should "afford substantial deference" to federal agencies regarding the "depth and breadth" of their environmental assessments and "should not micromanage" agencies' choices about these analyses, "so long as they fall within a broad zone of reasonableness." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 183 (2025). Courts retain the duty to interpret NEPA, including deciding what it means for an EIS to be "detailed." *Id.* at 180 (citing 42 U.S.C. § 4332(2)(C); *Loper Bright*, 603 U.S. at 391–92). However, because decisions about which potential effects and alternatives to analyze inevitably depend on "speculative assessments" and "predictive and scientific judgments" that are properly entrusted to agencies rather than courts, agencies are entitled to "substantial discretion" and "a reviewing court must be at its 'most deferential.'" *Id.* at 181–82 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

Applying this decision, the D.C. Circuit recently emphasized that neither NEPA nor the APA allows courts "to override reasonable agency judgments or explanations" arising from the evaluation of the environmental impacts of their proposed actions. *Save the Sound, Inc. v. Fed. Aviation Admin.*, 183 F.4th 763, 768 (D.C. Cir. 2026). So long as an agency has considered the relevant factors and acted "within a broad range of reasonableness," a reviewing court should not disturb its judgments. *Id.* at 776 (citing *Seven County*, 605 U.S. at 183).

Under these deferential standards, the Defendants' analysis at issue in this case is consistent with both NEPA and the APA.

***Prejudgment.*** First, the record does not show that the Defendants impermissibly prejudged the outcome of their site-selection process.

"NEPA does not require agency officials to be 'subjectively impartial,'" and "[a]n agency can have a preferred alternative in mind when it conducts a NEPA analysis." *Stand Up for*

*California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 303 (D.D.C. 2016) (BAH) (alteration in original) (quoting *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 712 (10th Cir. 2010)), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018). Accordingly, courts have found that an agency has impermissibly predetermined the outcome before completing its NEPA analysis only when "an agency has *committed* itself—for example, by contract—to an outcome." *Id.* (emphasis in original); *see also Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011) (explaining that an agency decisionmaker must not act with an "unalterably closed mind" or be "unwilling or unable" to give rational consideration to competing considerations). So long as an agency can still give "full and frank consideration" to the relevant environmental concerns, "[b]ias towards a preferred outcome does not violate NEPA." *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 206 (D.D.C. 2015) (CRC).

In this case, the record shows that the USAF candidly stated a preference for the Truax Field and Donnelly Field locations, but that it nonetheless gave full and detailed consideration to the environmental consequences associated with each of the five proposed sites included in its Final EIS and the "no action" alternative. *See, e.g.*, J.A., Dkt. No. 35-1 at 6–21 (summarizing analysis); *id.* at 26 (stating preferred alternatives).

Although Safe Skies argues that "the Secretary of the Air Force selected Truax Air Field in Madison, WI, to receive the F-35As" in May 2016 and that the Defendants "announced publicly" in December 2017 "that the F-35As are coming to a low-income, heavily minority community in Madison, Wisconsin," these assertions are not supported by the record. *See* Pl.'s Mem. at 16 (citing J.A., Dkt. No. 36-15 at 9; *id.*, Dkt. No. 36-9 at 18). The May 2016 decision that the Plaintiffs cite is the Secretary's approval of "Criteria" and "Candidates" for the USAF to use when choosing sites for the F-35A beddown, not a final commitment to the Truax Field site.

*See* J.A., Dkt. No. 36-15 at 6–9. Similarly, the December 2017 announcement that Safe Skies cites is the USAF's designation of "preferred alternatives," not a commitment to those sites. *See id.*, Dkt. No. 36-9 at 18. As is reflected in the public hearing transcript that Safe Skies cites, the USAF made clear that "although the preferred alternatives for the beddown ha[d] been announced," "no final decision ha[d] been made on the basing of the F-35 aircraft currently under analysis" before the preparation of the Final EIS. *Id.*

In sum, because the record shows that the USAF gave "full and frank consideration" to the environmental consequences of each of the alternatives under consideration and did not commit to any of those alternatives before completing its analysis, the Defendants did not violate NEPA by acknowledging a preference for the Truax Field site. *See Comm. of 100*, 87 F. Supp. 3d at 206.

***Effects of noise.*** Second, the record shows that the Defendants adequately considered how the additional noise resulting from the F-35A beddown would affect people who live, study, or work near Truax Field. *See* J.A., Dkt. No. 35-1 at 6–9 (summarizing analysis and conclusions); *see also id.*, Dkt. No. 35-6 at 3–17 (additional analysis of noise effects). The Final EIS concluded that selecting Truax Field for the project would result in "significant" changes in the noise environment surrounding the airport, including measurable effects on homes and schools. *Id.*, Dkt. No. 35-3 at 31, 36–37. The Final EIS specifically analyzed the negative effects of noise on children's learning and cognitive abilities, and it acknowledged—among other things—a measured connection between "chronic aircraft noise exposure" and "impaired reading comprehension and recognition memory." *Id.*, Dkt. No. 35-6 at 16–18. It noted that some of these effects could be mitigated by insulating schools and buildings against exterior noise, and it explained although the USAF is not authorized to use appropriated funds for off-base mitigation,

the Federal Aviation Administration offers funding for these kinds of noise mitigations. *Id.*, Dkt. No. 35-5 at 6–7, 10.

Safe Skies argues that the USAF should have given greater weight to the effects of noise on children, should have used a different noise threshold for assessing harmful impacts, should have made different assumptions when modeling the use of loud "afterburners," and should have chosen a site where fewer people would be exposed to loud noises. Pl.'s Mem. at 20–29.

However, the USAF's analysis was supported by the record and fully consistent with NEPA. Agencies are entitled to discretion when choosing methodologies for estimating environmental effects, and courts should not disturb an agency's judgments as long as "relevant information is available to those participating in agency decision-making" and the public can "understand and consider meaningfully the factors involved." *Save the Sound*, 183 F.4th at 773–74 (first quoting *Sierra Club v. FERC*, 153 F.4th 1295, 1306 (D.C. Cir. 2025); and then quoting *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 368 (D.C. Cir. 1981)); *see also Town of Cave Creek, Arizona v. FAA*, 325 F.3d 320, 326 (D.C. Cir. 2003) (noting that courts have "long accepted" the primary technique that the USAF used in this case "as the appropriate methodology for assessing the impact of aircraft noise"). Because the record shows that the USAF carefully considered noise effects of the proposed action, including how those effects might interrupt schooling and harm children's development and how those effects could be mitigated, the Defendants' analysis is consistent with NEPA's "purely procedural" requirements. *See Seven County*, 605 U.S. at 177. And because NEPA "does not mandate particular results," the Defendants were not required to choose a site that would have exposed fewer people to loud noises from F-35A operations. *See id.* (quoting *Robertson*, 490 U.S. at 350).

***Effects on water pollution, air pollution, climate change, and wildlife.*** Third, the record shows that the Defendants considered the proposed action's effects on water pollution, air pollution, climate change, and wildlife. *See* J.A., Dkt. No. 35-3 at 7–8 (addressing water resource impacts); *id.* at 36–38 (explaining that the USAF will monitor and remediate PFOS/PFOA contamination detected during construction, including by ceasing construction work to satisfy notice and consultation requirements, implement protective barriers, or take other necessary measures); *id.* at 39 (estimating air pollutant emissions and explaining that the USAF studied air quality effects "relative to federal state, and local air pollution standards and regulations"); *id.* at 42 (acknowledging that the proposed action "would contribute incrementally to the global warming that produces the adverse effects of climate change"); *id.*, Dkt. No. 35-4 at 26–31 (addressing potential effects on wildlife, including threatened and endangered species); *see also id.* at Dkt. No. 35-4 at 9 (highlighting location of Cherokee Marsh wetlands as partially within the area that would be affected by airport noise). Because NEPA requires only that an EIS "addresses the environmental effects of the project at hand" and the EIS in this case thoroughly examined effects on water pollution, air pollution, climate change, and wildlife and considered how those effects could be reduced or mitigated, the Defendants' analysis of these issues is consistent with NEPA. *See Seven County*, 605 U.S. at 192.

***Consideration of PFOS and PFOA contamination.*** Fourth, the record shows that the Defendants did not overlook the cumulative effects of additional water pollution or impermissibly forego a supplemental study in response to new information about PFOS and PFOA contamination. An agency must prepare a supplemental EIS if "new information" becomes available after the completion of a previous EIS that shows that major agency actions "will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already

considered." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989) (quoting 42 U.S.C. § 4332(2)(C)). In this case, the Final EIS itself acknowledged the existing contamination at Truax Field and explained how the USAF would monitor and remediate it if necessary. *See* J.A., Dkt. No. 35-3 at 37–38. In response to public comments on the Draft EIS, the USAF also explained that it did not expect the F-35A beddown to result in PFOS or PFOA contamination from sources other than construction. *See id.*, Dkt. No. 35-5 at 25–26. Safe Skies has not identified any "new information" postdating the Defendants' Record of Decisions that suggests a "significant" environmental effect "not already considered" in these earlier analyses. *See Marsh*, 490 U.S. at 374. On this record, the Court cannot say that the Defendants overlooked the potential consequences of incremental pollution or erred by failing to prepare a supplemental EIS focused on PFOS and PFOA contamination.

***Consideration of alternatives.*** Fifth, the record shows that the Defendants adequately considered alternatives, including evaluating the "no action" alternative. J.A., Dkt. No. 35-1 at 6–21 (summarizing analysis). Safe Skies argues that the Defendants should have considered moving operations to another nearby field or retiring the F-16 aircraft stationed at Truax without replacing them with F-35As. *See* Pl.'s Mem. at 38–39. However, the Defendants were not required to study these alternatives in their Final EIS. Agencies are required to consider only those alternatives that "'will bring about the ends of the federal action,'" and they "may concisely reject alternatives that do not achieve a project's purpose." *Citizens Action Coal. of Indiana, Inc. v. FERC*, 125 F.4th 229, 238–39 (D.C. Cir. 2025) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)). In this case, the USAF did just that: it prioritized alternatives that it decided had the characteristics needed to satisfy its purpose for placing F-35A aircraft at ANG installations, including an existing fighter aircraft mission and a runway of sufficient length. *See* J.A., Dkt. No.

35-1 at 29–30, 36, Dkt. No. 35-2 at 7–9. The Supreme Court has recently warned against efforts to "micromanage" agency choices about which alternatives to consider and study in an EIS, emphasizing "the level of deference demanded by" NEPA's text and earlier precedents. *Seven County*, 605 U.S. at 182–83. Consistent with these precedents, this Court will not second-guess the Defendants' decision to perform a detailed analysis of only the "no action" alternative and the five potential sites that, in the USAF's judgment, were the best fit for the operational objectives of the F-35A beddown mission.

***Consideration of environmental justice.*** Sixth, the record shows that the Defendants adequately considered the relative effects of each alternative on low-income populations, minority populations, and children. In the Final EIS, the USAF candidly acknowledging that its preferred sites at Truax Field in Madison and Donnelly Field in Montgomery would result in "significant" and "disproportionate" increases in noise exposure for low-income and minority communities and children, while three of the other proposed sites would not have these undesirable distributional effects. *See* J.A., Dkt. No. 35-2 at 22–23. In its Record of Decisions, the USAF again acknowledged the adverse distributional effects of choosing Truax. *Id.*, Dkt. No. 35-6 at 31. Although Safe Skies argues forcefully that the Defendants should have given greater priority to environmental justice considerations, "NEPA does not compel any particular policy decision by the agency." *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1186 (D.C. Cir. 2023); *cf.* Pl.'s Mem. at 34. And although Safe Skies argues that the Defendants should have used different methodologies to estimate the environmental justice effects of choosing the Truax site, the USAF reasonably explained both its methodology and conclusions. *See* J.A., Dkt. No. 35-5 at 21 (explaining why the USAF used the 65 dB DNL metric in its noise-level analysis); *id.* at 25–26 (explaining how the USAF intended to assess and mitigate PFAS and PFOA contamination).

Because "NEPA does not . . . prescribe the way in which the agency presents its analysis" and the record shows that the USAF gave the required "hard look" at environmental justice considerations, the USAF's analysis of these issues is consistent with NEPA, notwithstanding Safe Skies' objections to the specific metrics that the USAF presented in the Final EIS. *See Citizens Action*, 125 F.4th at 240–41; *Robertson*, 490 U.S. at 350.

***Notice and opportunities for public participation.*** Seventh, and finally, the record shows that the Defendants provided adequate notice and opportunities for public participation.

At the times relevant to this case, the governing NEPA regulations provided that agencies must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures" and "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6(a)–(b) (2018). Determining whether the public was adequately involved" in the NEPA process "is a fact-intensive inquiry made on a case-by-case basis." *Biodiversity Conservation Alliance v. Bureau of Land Mgmt.*, 404 F.Supp.2d 212, 220 (D.D.C.2005) (RJL). When deciding whether an agency has satisfied its public notice obligations, courts consider whether the agency has "provide[d] enough information" to enable informed participation and whether its notices "actually did lead to public participation." *Stand Up for California! v. United States Dep't of the Interior*, 994 F.3d 616, 629–30 (D.C. Cir. 2021).

Safe Skies argues that the USAF should have provided notices of public meetings in additional outlets, published notices in languages other than English, chosen different sites for its public meetings, and disclosed comments it received from the Federal Aviation Administration ("FAA"). *See* Pl.'s Mem. at 40–44. However, the record shows that the USAF made diligent efforts to encourage informed public participation, which resulted in thousands of written

comments and hundreds of people attending a public meeting about the Draft EIS that the USAF held near Truax Field. *See* J.A., Dkt. No. 35-7 at 13–14 (explaining that the USAF made the Draft EIS available online; published advertisements in two Wisconsin newspapers; issued press releases, mailings, and flyers; and held public meetings); *id.* at 16–21 (describing hearing attendance and comment volume); *see also id.* at Dkt. No. 35-5 at 23 (explaining that the public meeting was held in the closest venue to Truax Field that was adequate and available during the comment period). Meanwhile, this Court has already held that the USAF properly withheld the FAA's interagency comments under the deliberative process privilege, and Safe Skies has offered no persuasive reason for reconsidering that decision. *See* Order, Dkt. No. 25 at 4–5. On this record, the Court concludes that the Defendants' efforts to involve the public in its evaluation of potential sites for the F-35A beddown were diligent and consistent with NEPA.

* * *

In sum, the record shows that the Defendants engaged in "reasoned decisionmaking," considered the relevant factors, and acted "within a broad range of reasonableness" when evaluating the environmental effects of placing F-35A aircraft at Truax Field. *See State Farm*, 463 U.S. at 52; *Save the Sound*, 183 F.4th at 776. Although the Defendants could reasonably have weighed the significant environmental consequences of their decision differently and decided to place these aircraft at a different location, neither the NEPA nor the APA allows this Court "to override reasonable agency judgments or explanations" based on its own assessment of the evidence. *See Save the Sound*, 183 F.4th at 768. The Final EIS and Record of Decisions reflect that the Defendants carefully considered the environmental consequences of selecting Truax Field, planned mitigation measures to alleviate some of those consequences, and ultimately decided that placing F-35As at Truax Field was an appropriate choice to achieve the USAF's operational

objectives, which included replacing aging fighter aircraft and placing new F-35As in locations where ANG personnel could effectively train to fly them. *See* J.A., Dkt. No. 35-1 at 1–3; *id.*, Dkt. No. 35-6 at 27–36. Because the Court must "afford substantial deference to the agency as to the scope and contents of the EIS" and limit its role to "check[ing] that [the EIS] addresses the environmental effects of the project at hand," the Defendants are entitled to summary judgment on each of the Plaintiff's claims. *Seven County*, 605 U.S. at 192.

Given the limited scope of this Court's review under NEPA and the APA, this decision is necessarily limited to matters reflected in the administrative record that was before the Defendants when they adopted the Final EIS and the Record of Decisions in which the USAF selected Truax Field for the F-35A beddown. Whether the Defendants acted reasonably after they had made their site-selection decision, including whether they adequately implemented the planned mitigation measures reflected in the Final EIS and Record of Decisions, is beyond the scope of this case and this decision.

## IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT** the Defendants' [29] Motion for Summary Judgment and **DENY** the Plaintiff's [28] Motion for Summary Judgment. An appropriate Order accompanies this Memorandum Opinion.

**Dated:** September 11, 2026

Colleen Kollar-Kotelly

COLLEEN KOLLAR-KOTELLY
United States District Judge